UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

HDR ENVIRONMENTAL,
OPERATIONS AND CONSTRUCTION,
INC.,

           Plaintiff,

v.

DARWIN DEASON; and DOES 1-100
inclusive

           Defendant.

Case No.:  15cv1402 JAH (NLS)

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S
MOTION TO DISMISS [DOC. NO 30]**

## **INTRODUCTION**

      Pending before the Court is Defendant Darwin Deason's ("Defendant" or "Deason") Motion to Dismiss Plaintiff HDR Environmental Operations and Contruction, Inc,'s ("HDR" or "Plaintiff") Second Amended Complaint ("SAC") for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [Doc. No. 30].  HDR's SAC alleges four causes of action:  (1) breach of contract, (2) money due and owing on an open book account, (3) a quantum meruit claim for work, labor and services provided, and (4) promissory fraud. After a careful review of the pleadings, relevant law, and reasons set forth below, Defendant's motion to dismiss is **GRANTED  IN PART** and **DENIED IN PART**.

# BACKGROUND

This matter arises from a contract dispute. The following facts are taken from Plaintiff's SAC, the written agreement between the parties, including amendments and modifications, as well as documents in the form of written communications incorporated by reference, integral to, or explicitly relied upon in the Complaint.

## I. FACTUAL BACKGROUND

In 2011, Deason began the demolition and reconstruction of his residence located at 1900 and 1912 Spindrift Drive (hereinafter the "Spindrift Sites") along the La Jolla coast in the City of San Diego, California. *Doc. No. 29, p2; SAC ¶ 6*. HDR and Deason entered into an agreement for HDR to perform work at both sites, including the excavation, recovery and monitoring of soils containing Native American artifacts (including human remains). *Id.* To comply with regulations implemented by the City of San Diego, HDR proposed an Alternative Archaeological Data Recovery Mitigation Monitoring and Reporting Program ("Alternative MMRP Program") for the excavation and analysis of a Native American habitation and burial site where the potential to encounter intact human remains was high. *Doc.No.29, p20; SAC Ex 1*. The Alternative MMRP Program included three main components: (1) the Archeological Data Recovery Program (ADRP), (2) a Cultural Materials Inventory Program (CMIP) and Mitigation Monitoring. *Id.*

In the original proposal, dated November 14, 2011, HDR outlined work to be done under each component, identifying a project area of approximately 230 square meters of the Spendthrift Site at 1912 Spindrift Drive. *Id. at 20-22*. The Archeological Data Recovery ("ADR") consisted of the excavation of 30 square meters of the approximately 206 square meters of deposits to be impacted. *Id. at 20*. In addition, for the portions of the site that were disturbed [by construction] or the portions that were intact and not subject to the ADRP, HDR recommended a Cultural Material Inventory Program (CMIP) be implemented. *Id. at 21*. Within the project area, HDR "estimated 326m$^3$ of sediment would be processed, either by hand or mechanically excavated. *Doc.No.30-3, p10; Def's. Ex 1*. Finally, HDR offered monitoring of any remaining ground disturbing construction and

landscaping activities after the completion of the ADRP and CMIP phases. *Doc.No.29, p22; SAC Ex 1.*

Estimating a total cost of $451,864.76, HDR listed thirteen assumptions in which the estimated cost was based – namely:

> 8. …[A] total of 206 square meters of Site CA SDI-39 will be impacted by the proposed development… [o]f the …176 square meters that were subject to CMIP treatment, half (88 square meters) would require excavation to a maximum depth of 2 meters and the other half would require a maximum depth of 1 meter within the project area[1]. *Id. at 24; SAC Ex 1.*

The proposal also estimated 688 man hours of fieldwork. *Id.*

The parties added the "1900 Spindrift Drive Scope of Work ("SOW") Addendum" in which HDR assumed responsibility for CMIP treatment of 143 square meters (55.8 m$^3$ of sediment), with compensation not-to-exceed $64,046.20. *Doc. No. 29, p.4-5; SAC ¶19-20; Doc. No 30-3, p.6; Def's.Ex: 1.* This resulted in total compensation for time and materials not-to-exceed $515,910.96 for both sites. *Doc. No. 29, p.4-5; SAC ¶19-20.*

The Short Form Agreement ("Agreement"), attachments and addendum included, and/or referenced by incorporation, the following pertinent provisions:

**SECTION II:  TERMS AND CONDITIONS OF ENGINEERING SERVICES**

PROVISION 12: CHANGES

> The parties agree that no change or modification to the Agreement, or any attachments hereto, shall have any force or affect unless the change is reduced to writing, dated, and made part of this Agreement.  The execution of the change shall be signed in the same manner as the Agreement. Adjustments in the period of services and in compensation shall be in accordance with applicable paragraphs and sections in this Agreement… In any event, as the project progresses, the facts developed may dictate a change in the services to be performed, which may alter the scope. ENGINEER will inform OWNER of such situations so that changes in scope and adjustments to the time of performance and compensation can be made as required. If such change, additional services, or suspension of services results in an

---

[1] The total amount of ground soil disturbance based on surface area was provided to HDR by Defendant's general contractor and architect. HDR relied on the representations of Plaintiff's agents to determine the work to be performed and calculate the "not-to-exceed" price quote.

3

increase or decrease in the cost of or time required for performance of the services, an equitable adjustment shall be made, and the Agreement modified accordingly.

PROVISION 13: CONTROLLING AGREEMENT

These Terms and Conditions shall take precedence over any inconsistent or contradictory provisions contained in any proposal, contract, purchase order, requisition, notice-to-proceed, or like document.

## SECTION IV:  COMPENSATION

Compensation for Engineer's services under this Agreement shall be on the basis of Time and Materials not to exceed…. $515,910.96.

## SECTION V: PERIOD OF SERVICE [2]

 … If any specified dates for the completion of Engineer's services are exceeded through no fault of the Engineer, the time for performance of those services shall be automatically extended… and all rates, measures and amounts of Engineer's compensation shall be equitably adjusted.

On May 15, 2012, HDR submitted the 1900 and 1912 Spindrift Drive Modification Request ("Modification Request") as a result of "changes in the construction work plan…the amount of disturbance to culturally-bearing soils…cultural data uncovered, …[and] changes in the landscape plans." *Doc 30-3, p.2; Def's. Ex: 1*. HDR discusses the challenging nature of treating cultural resources and the unknown factors that can be (and were) exposed during demolition. *Id*. HDR noted impacts to cultural resources due to the landscaping improvements, demolition, and tree stump removal. *Id. at 3-5; Def's.Ex: 1*. HDR indicated that "substantial additional landscaping was undertaken" impacting and extending beyond the original expected scope requiring "unanticipated monitoring and screening… [and] result[ing] in the need for CMIP excavations, significantly increasing

---

[2]  Handwritten revision initialed "DW" and dated December 7, 2011 amends this provision to read in pertinent part: "[I]if any specified dates for the Completion of ENGINEER's services are exceeded… yet the scope of services for the project remain unchanged, then the ENGINEER's compensation as described under Section IV of this Agreement will remain the same."

4

the cost of the overall project. " *Id.* Additionally, it notes that such "improvements for the 1900 Spindrift Drive property are ongoing and may continue to change."

The Modification Request states that the original proposal greatly underestimated the anticipated *depth* of intact cultural materials and midden soils on site. *Id. at 7*; *Def's. Ex: 1*. The original 1912 Spindrift Drive SOW stipulated to the excavation of 36 cassions. However, in the Modification Request, HDR placed the number of proposed caissons at 50, with the CMIP Treatment Plan resulting in greater levels of examination and an increase of labor to 835 man hours. *Id.* In sum, to meet the conditions of the contracted scope of work and to recover expenses related to "out-of-scope" efforts, HDR outlined an additional cost of $66,191.96 for treatment of an additional $24m^3$ at 1912 Spendrift and $93,701.12 for examination of an additional $41.7m^3$ at 1900 Spindrift. *Doc 30-3, p.6,10; Def's. Ex: 1*. The new combined total compensation was "not to exceed" $675,804.04 as confirmed by Jeff Hokanson, Vice President HDR EOC on or about May 21, 2012. *Id. at 14-15; Def's. Ex: 2*.

The Modification Request concluded with the following:

**Assumptions for 1900 and 1912 Construction and Cost**

In order for HDR EOC to successfully complete the cultural resource recovery program for 1900 and 1912 Spindrift, it is imperative that we are able to effectively communicate landscape issues and demolition problems that have a significant impact to the existing cost structure. We believe that in order to prevent such significant changes in the future, the following assumptions/ stipulations need to be understood between both parties. If the modifications listed above are accepted, *no additional changes or modification requests will be made* unless:

a)  Intact human remains or intact cultural features are found, and/or
b)  It is determined by the regulators that the landscaping proposed for 1912 requires CMIP treatment.

Further, HDR agreed:

[T]o not, *under any circumstance*, complete additional *out-of-scope work* without *written approval* from the client or the *client's representative*. If additional out-of-scope work is identified, HDR EOC will wait until a *clear understanding* between HDR EOC and the client is reached. Finally, HDR EOC understands that Bruce Mezan is our designated point person for vetting and approving any additional change orders.

*Doc 30-3, p.12; Def's. Ex: 2.*

In late 2012, Plaintiff alleges Defendant's contractor, Sharratt Construction, disturbed significantly more soil than that outlined in the permit application and approved by the City's Planning Department in the July 2011 Final Mitigated Negative Declaration. *Doc. No. 29, p.3,4; SAC ¶¶9, 14.* The volume of material to be excavated nearly doubled the amount covered by the Modification Request due to the disturbance of a much larger surface area. *Id. at 5-6; SAC ¶24.* HDR requested a second contract modification. Although the parties agreed during negotiation of the first modification request that HDR would not charge for additional work due to increase *in depth*, no agreement was reached for additional disturbed soil outside of the agreed surface area. *Id. at 5; SAC ¶23.* The parties were unable to reach an agreement as to the terms of the second contract modification and HDR ceased all work. *Id. at 6; SAC ¶26.*

HDR returned to the Project around December 26, 2012, after being threatened with a lawsuit for delay damages, replacement costs, and punitive damages. *Doc. No. 29, p.6; SAC ¶27.* On February 9, 2013, Defendant's son, Doug Deason ("Doug"), spoke with Brian Hoppy ("Hoppy"), the director and Senior Vice President of HDR's Environmental Sciences and planning division. *Id. at 10; SAC ¶53(c).* Plaintiff alleges during the phone conversation, Doug agreed HDR should receive a second contract modification for material processed over and beyond the $290m^3$ identified in the original contract and stipulated modification. *Id.* Plaintiff further alleges that at an in-person meeting on February 19, 2013, Doug agreed to execute a second modification to process an additional $300m^3$. *Id. at 11; SAC ¶53(b)-(d).* On February 27, 2013, HDR sent a "scope and cost modification proposal" to process an additional $300m^3$ of soil at the 1912 Spindrift property. *Doc. 30-3, p.31;Def's Ex: 7.* As the terms were being negotiated, Doug urged HDR to expedite the completion of project and get them to "the finish line." *Id. at 23; Def's. Ex: 5.* While HDR's second modification request was being reviewed, HDR expressed a commitment to completing the job and agreed to remain on-site. *Id. at 34; Def's Ex: 8.* In response, Doug replied "We are committed as well. We will get it done, I am confident." *Id.*

By March 24, 2013, still no written agreement had been executed. HDR informed Defendant, through Doug, that their "cost is simply a function of the amount of soil to be excavated…we process the soil to keep you in compliance with your permit and associated regulations. The less soil removed, the lower the cost…the data provided by [Deason's general contractor] has been consistently incorrect and understated with respect to the area to be disturbed – the area we based our soil calculation on….We will only invoice up to the amount of soil we process and nothing further." *Id. at 39; Def's Ex: 10.*

Negotiations continued into April, 2013. The parties agreed that between February and April 5, 2013, 185.71 m/ 242.9 cy of soil had been excavated, with an estimated 48.66 m/63.65 cy remaining, totaling 234.37 m/306.55 cy. *Doc. No.30-3, p.44-45; Def's Ex:* 12. On April 17, Doug requested, a revised "cost plus not to exceed price" proposal for his father's review based on the specific volumes laid out above, with a provision for change orders to be drafted by HDR and approved by Deason before any additional work commenced. By April 23rd, the parties agreed that the second modified proposal should reflect an additional volume of $220m^3$, of which 84% had already been processed. *Id. at 47; Def's Ex: 13.* HDR warned, however, that the $220m^3$ would ultimately be exceeded due the last minute addition of a new wall on the property. *Id.* The next day, HDR agreed that any amount over the $220m^3$ could be added to a later modification, but expressed a need to have the second proposal executed promptly in an effort to recoup costs. *Id.* Follow-up emails were sent by Hoppy on April 29th, May 1st, and May 7th. *Id. at p.49; Def's Ex: 14.*

On May 7th, Doug replied relaying Defendant's position that the original contract was a "gross maximum price" contract for HDR to provide services at a capped price and Defendant would not be signing the second modification proposal as presented. *Id. at 53; Def's Ex:* 15. According to Doug, this was "obviously… [a] position [they had] been in for some time now. *Id.* Admitting that there was some extra work created when intact human remains were found, Doug communicated a belief that Defendant would make

payments for the work performed by HDR per the original contract and "some kind of compromise on the additional work" HDR did not anticipate[3]. *Id*.

In response, Hoppy advised that the "not-to exceed" cost was based on a "well defined amount of soil to be processed," stating:

> The identification of human remains is one way that the project would have deviated from our agreement. Surpassing the maximum amount of soil to be processed is another. We do not control the construction process or the amount of soil removed for the project. That is 100% controlled by your design and construction contractors.

*Doc. No. 30-3, p.51-52; Def's Ex: 15*

Another week passed without an agreement. On May 14th, Doug emailed, "I am working on a compromise response now. I will send it over to dad tonight for approval and then send it to you in the morning." *Id. at 55; Def's Ex: 16.* No compromise or counter proposal was sent. On May 16th, HDR indicated its intent to reengage its attorneys and place a lien on the property. *Id*. Doug reiterated Deason's legal stance on the issue and concluded by indicating a belief that Defendant would be willing to pay $100,000 after the completion of the project and receipt of the final report, accepted and agreed to by the City of San Diego and Red Tail Monitoring per MMRP requirements. *Id. at p.60; Def's Ex: 17*.

HDR completed all fieldwork on June 28, 2013, which included examination of 625m[3] of soil, identification of 25,766 artifacts, and processing of 1,188 human remains. *Doc. No. 29; SAC ¶ 29*-30. HDR's report was submitted and accepted by the City of San Diego on December 23, 2014. HDR asserts a balance due and owing of $1,125, 485.16[4], not including interest, as a result of services performed from December 26, 2012 through March 17, 2015. *Doc. No. 29; SAC ¶ 44; SAC Ex:3.* On June 22, 2015, Defendant tendered

---

[3] Prior to the parties opening a dialogue, HDR billed Defendant $31,761.60 for "the 1900 extra plantings" (invoice 33328-B) and 36,961.21 for "the 1912 Features" (invoice 43593-B), totaling $68,722.81, covering both in-scope and out of scope work.

[4] The FAC indicates a $576.85 decrease in the principal sum owed from that which was plead in the original Complaint.

$58,621.27, representing the balance remaining of the total "not-to exceed" amount quoted in the modified contract. *Doc. No. 30-2, p.3; Def's Decl.*

## II.  PROCEDURAL BACKGROUND

HDR initiated the instant action on June 25, 2015.  On September 14, 2015, it filed an Amended Complaint ("FAC").  Defendant then filed a counterclaim and a motion to dismiss the FAC.  This Court granted Defendant's motion to dismiss as to the quantum meriut and promissory fraud claims with leave to amend.   Plaintiff filed the SAC on July 21, 2016.  Defendant's fully briefed Motion to Dismiss Plaintiff's SAC is now before the Court.

## DISCUSSION

Plaintiff's SAC alleges four causes of action:  a claim for breach of contract, two common counts including money due on an open book account and a quantum meruit claim, and a cause of action for promissory fraud.  Defendant again moves to dismiss each cause of action under Rule 12(b)(6) for failure to state a claim upon which relief may be granted.  The Court will reexamine the sufficiency of the Complaint as to each cause of action in light of newly submitted documents attached to Defendant's second motion to dismiss and referred to or relied on by Plaintiff in its Complaint.

## I.  LEGAL STANDARD

Rule 12(b)(6) tests the sufficiency of the complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984); *see Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law.").  Alternatively, a complaint may be dismissed where it presents a cognizable legal theory yet fails to plead essential facts under that theory.  *Robertson*, 749 F.2d at 534.  While a plaintiff need not give "detailed factual allegations," he must plead sufficient facts that, if true, "raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 547). A claim is facially plausible when the factual allegations permit "the court to draw reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, "the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief. *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009). "Determining whether a complaint states a plausible claim for relief will…be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950.

In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). However, the court need not accept as true legal conclusions cast in the form of factual allegations, nor factual allegations that contradict matters properly before the court as exhibits. *Ileto v. Glock, Inc.,* 349 F.3d 1191, 1200 (9th Cir. 2003); *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), opinion amended on denial of reh'g, 275 F.3d 1187 (9th Cir. 2001).

When ruling on a motion to dismiss, the Court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matter of which the Court takes judicial notice. *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). If a court determines that a complaint fails to state a claim, the court should grant leave to amend unless it determines that the pleading could not possibly be cured by the allegation of other facts. *See Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

## II.  ANALYSIS

### A. FIRST CAUSE OF ACTION: BREACH OF CONTRACT

To establish a *prima facie* case for breach of contract, a plaintiff must plead and prove four elements: "1) [A valid] contract, 2) plaintiff's performance or excuse for nonperformance, 3) defendant's breach and 4) damage to the plaintiff therefrom." *Wall St. Network, Ltd. v. N.Y. Times Co.*, 164 Cal. App. 4th 1171, 1178 (2008). A breach is an unjustified, defenseless, or unexcused failure to perform an absolute duty which is promised in a contract. *See* Rest.2d, Contracts § 235(2). Before an absolute duty to preform arises, all conditions must be either satisfied or excused. *Platt Pac., Inc. v. Andelson*, 6 Cal. 4th 307, 313 (1993).

Neither party disputes the formation of a valid contract. However, Plaintiff alleges that Defendant breached the terms of their written agreement, including the amended Short Form Agreement, terms and conditions as incorporated therein, and HDR's Modification Request (collectively referred to as "the operative contract") by refusing to pay a principal balance of 1,125,484.16 for services rendered. Defendant contends that HDR seeks payment in excess of the clear "not-to-exceed" ceiling, did not have written approval or a clear understanding between the parties for a second contract modification, and has not alleged any legitimate exception under the operative contract to increase the maximum payment obligation. The Court first addresses the conditions and requirements as outlined in the Modification Request.

### 1. Modification Request

#### a. Underlying Assumptions

First, it is important to note that the Modification Request is an amendment to the "Scope of Services" and "Compensation" provisions of the Short Form Agreement. Therefore, it is to be read in conjunction with the original underlying contractual assumptions and provisions. Defendant asserts the written contract does not limit the maximum horizontal or "surficial area." However, all estimated costs, whether outlined in the original contract or the Modification Request were based on an underlying assumption

that the surficial ground area to be impacted by the development and subject to excavation was fixed.  The defined surface area was identified in the "Scope of Services" provision. Viewing the facts in the light most favorable to Plaintiff, HDR did not have reason to assume that the area of ground disturbance would increase to more than double that listed by Defendant in the City permit application. Further any ambiguity in the underlying assumptions of the contract is dispelled by the parties' stipulated modification, which states "HDR ECO estimated [and devised a budget for] 326m$^3$ plus an additional 24 m$^3$ of sediment at the 1912 Spindrift site and 55.8 m$^3$ plus an additional 41.7m$^3$ at the 1900 Spindrift site.  *See Doc 30-3, p. 6,10; Def's. Ex:* 1.

Altering the underlying assumption, on which an agreement is based, may significantly affect costs. *See Commissioner v. Standard Life & Accident Ins. Co., 433 U.S. 148 (1977) (*discussing favorably the NAIC accounting system which recognizes the difference between routine adjustments to reserves and extraordinary increases or decreases resulting from a change in the underlying assumptions); *Cummins-Allison Corp. v. SBM Co.*, 669 F. Supp. 2d 774, 777 (E.D. Tex. 2009), aff'd, 484 F. App'x 499 (Fed. Cir. 2012) (It is self-evident that changing the assumptions of an economic analysis will change the results). Consequently, the three exceptions detailed in the conclusion of the Modification Request were not the only factors that could result in a price/cost increase.

### b. Conditions: Understanding and Prior Written Approval

Second, Defendant argues that a prior understanding and written approval was required to trigger the obligation for payment in excess of the contractual maximum. By its "very nature - a guaranteed maximum price contract - discloses an objective intent to require preapproval of all costs exceeding the maximum price." *Lauth Grp., Inc. v. Sygma Network, Inc.*, No. CV 07-07808 GAF(AGRx), 2009 WL 10669362, at *7 (C.D. Cal. Mar. 5, 2009). The "prior written approval" and "clear understanding" conditions for completing additional "out of scope" work were set forth in the Modification Request.

This Court, construing facts in the light most favorable to the non-moving party, previously found  that Doug, Defendant's son, made oral and *written* representations that

Plaintiff would be compensated for the additional work performed on the project. *Doc. No. 28, p.6*  The Court revisits this finding now having before it the email communications upon which Plaintiff bases its allegations.  The written representations by Doug indicate an intent to agree or an agreement to finalize a second modification, and communicated *a belief* that Defendant would make payments for the work performed by HDR under the original contract and "some kind of compromise on the additional work" HDR did not anticipate. *Doc. No. 30-3, p.53*; *Def's Ex 15*.  Although agreeing to a modification and compromise implicitly assumes an increase in compensation, no clear, direct, or definite terms were represented with any certainty.  "To enforce a [written agreement] at law, the offer must be sufficiently definite or must call for such definite terms in the acceptance, that the performance required is reasonably certain." *Spellman v. Dixon*, 256 Cal. App. 2d 1, 3, (1967) (an agreement must not only contain all the material terms but also express each in a reasonably definite manner"). On review of the facts, the Court finds Defendant's son's written representations were insufficient to create an enforceable written agreement for a breach of contract claim.

Instead, HDR and Defendant's son, "agree[d] to agree" to a second modification at some date in the future.  In such situations, the California Supreme Court has held:

> [T]hat the enforceability of a contract leaving some of its terms to future determination depends on the relative importance of the unsettled term. (Ibid.) Where "the indefinite promise is so essential to the bargain" that an inability to enforce it renders enforcement of the remainder of the contract unfair, the contract *may* be abandoned.

*Ted Jacob Eng'g Grp., Inc. v. The Ratcliff Architects*, 187 Cal. App. 4th 945, 965, (2010) (quoting *Coleman Engineering Co. v. North American Aviation, Inc*. 65 Cal.2d 396, 405 (1966)).

As discussions ensued, Doug urged HDR to complete the project. Plaintiff alleges that prior to Doug's representations and assurances, Defendant's attorney stepped in on behalf of Defendant, threatening to bring suit against HDR when it terminated performance and refused to "complete the additional out-of-scope work without written approval."  As a result of the attorney's threat and Doug's insistence on completion, Plaintiff returned to

work to mitigate any potential damages claims for delay and to comply with city regulatory requirements. The Complaint alleges HDR agreed, "to complet[e] [the] job for [Doug] and [Defendant]…and continue to work as [they]…work through the details of the [second] contract modification." Whether expressly through his Doug's oral and written representations, his attorney's affirmative and allegedly coercive actions, and/or implicitly through his own omissions, the Court, assuming the truth of all factual allegations, finds Defendant compelled or coerced HDR to proceed "to the finish line" without first having a "clear understanding" of the out-of-scope work to be completed.

Nonetheless, Defendant asserts that the provisions laid out in the Modification Request supersede the general terms of the original agreement and to find otherwise would be inconsistent with the purpose of the modification to insure a predictable maximum fee. This argument is unpersuasive in light of the language within provision 13 of Section II of the Short Form agreement (i.e. the original contract). Provision 13, entitled "Controlling Agreement," states that "these Terms and Conditions [i.e. provision 12] *shall take precedence over any inconsistent or contradictory provisions contained in any proposal, contract, purchase order, requisition, notice-to-proceed, or like document*." (emphasis added).

### 2. Provision 12: CHANGES

The Changes provision allows for an adjustment to compensation if circumstances arise which "alter the scope" of services to be performed. The Changes provision required all "change[s] [be] reduced to writing" and the agreement be revised - whether before or after any additional work commenced - if circumstances required a modification in the services to be performed. Plaintiff was to inform Defendant "of such situations so that changes in scope and adjustments to the time of performance and compensation [could] be made as required," at which point an equitable adjustment would be made and the contract modified accordingly. The parties abided by this provision when they executed the May 21, 2015 Modification Request due to a change in circumstances. Viewing the evidence in a light most favorable to the non-moving party, the Court finds that the Modification

Request did not expressly supersede the general terms of the original agreement. Once the additional out-of-scope work was identified by Plaintiff and communicated to Defendant, the terms called for a writing to memorialize the change, including any adjustment to compensation, despite any contrary terms or conditions within the Modification Request. The parties' original agreement included the prediction of situational changes resulting in equitable adjustments, which constituted a material aspect of the bargain.

Plaintiff alleges after May 21, 2015, when the first Modification Request was executed, significant changes to the scope of work surfaced as the project progressed and the construction plan continued to change. Again the parties attempted to negotiate under Changes Provision 12 of Section II, which encompassed the original terms and conditions.

Despite the attention drawn to this provision, the Complaint does not allege a breach due to a cardinal change or a fundamental alteration, nor does it assert an equitable cause of action under the constructive change doctrine[5]. Instead, Plaintiff elects to allege a breach for failure to pay for services that it concedes were not "reflected in the executed agreements." The terms of a proposed second modification were neither "made part of the agreement" nor "signed in the same manner as the agreement" as required by the Changes provision. "There is no binding [agreement] when 'it is clear… from a provision that the proposed written [agreement] would become operative *only* when signed by the parties as well as from … other evidence … that both parties contemplated…acceptance of the [agreement's] terms would be signified by signing it[.]'" *Vita Planning & Landscape Architecture, Inc. v. HKS Architects, Inc*., 240 Cal. App. 4th 763, 773 (2015) (quoting *Banner Entertainment, Inc. v. Superior* Court, 62 Cal.App.4th 348, 358 (1998)). A written agreement as to the "out of scope" work may have been executed by the parties at any time. Undeniably, Plaintiff vigorously sought, and defendant entertained, a new written

_____

[5] "The doctrine of 'constructive change' is a legal fiction created "by the federal judiciary and federal boards of contract appeal to (1) remediate contractor claims for extra work, and (2) permit contractors to perform disputed work without having to risk abandonment of their contracts to preserve their claims." 1A Bruner & O'Connor Construction Law § 4:25.

agreement under the Changes provision, despite their inability to reach a meeting of the minds.

Without alleging sufficient facts to show compliance with provision 12 of the operative contract or asserting a claim for breach under an alternate theory, Plaintiff's cause of action for breach of contract due to defendant's failure to pay for the out of scope work cannot be maintained. The Court **GRANTS** Defendant's motion to dismiss the breach of contract claim with leave to amend.

## B. SECOND CAUSE OF ACTION: OPEN BOOK ACCOUNT

An open book account is a detailed ledger that serves as a record for transactions between two parties that arise out of a contractual or fiduciary relationship. *Cal. Code Civ. Pro. § 337a.*

> To prevail on an open book account claim, a plaintiff must show that: (1) Plaintiff and Defendant had financial transactions; (2) that Plaintiff kept an account of the debits and credits involved in the transactions; (3) that Defendant owes money on the account; and (4) the amount of money that Defendant owes Plaintiff. Under California law, money due under an express contract cannot be recovered in an action claiming an open book account unless there is a contrary agreement by the parties. [C]ourts require that the parties expressly intend to be bound because accruing debts under an express contract are not normally considered the subject of an open book account. The mere incidental keeping of accounts does not alone create a book account. (Internal citations and quotation marks omitted).

*Eclipse Grp. LLP v. Fortune Mfg.*, No. 14CV0441-GPC-WVG, 2015 WL 1511033, at *5 (S.D. Cal. Mar. 4, 2015).

In support of the open book account claim, Plaintiff submits an invoice dated July 18, 2016. Plaintiff alleges Defendant became indebted to Plaintiff in the amount of $1,125,485.16 on an open book account for services performed at Defendant's request and Defendant has not paid any part of the outstanding monies owed. *SAC ¶ 39, 40.*

Defendant moves to dismiss the open book claim, contending that the binding written contract limits further billing by HDR. Defendant also asserts that Plaintiff cannot seek recovery under an equitable claim for open book because there is an express contract in place. The Modification Request indicates the operative contract and guaranteed

maximum price covered work up to a fixed volume of sediment to be processed. The terms of the proposed second modification were never agreed upon, and therefore any debt accruing for the "out of scope" work did not fall under an express contract. Nonetheless, in order to assert a claim for an open book account, Plaintiff's pleading must meet certain requirements.

Defendant argues that Plaintiff's simple invoice does not meet the requisite detailed statement required to support an open book claim. According to Defendant, the single invoice dated July 18, 2016, does not reflect an ongoing account of debits and credits entered in the regular course of business. *See Tsemetzkin v. Coast Federal Savings & Loan Assn.*, 57 Cal.App.4th 1334, 1343 (1997).

The Complaint alleges: (1) Plaintiff and Defendant engaged in financial transactions, (2) for which Plaintiff maintained an account of debits and credits, and (3) Defendant owes a specified amount on the account. Plaintiff also alleges it continued work based upon an oral understanding or agreement with Doug and was advised by Defendant's attorney it had a duty to complete performance, creating a contractual or fiduciary relationship. In light of the Court's finding that the "out of scope" work did not fall under an express contract, accruing debts for such work may properly be considered the subject of an open book account. The extent of the detail of Plaintiff's accounting records is a matter for summary judgment or trial, not a motion to dismiss - as currently before the Court. Plaintiff's allegations of an agreement and the specific conduct of the parties are legally sufficient to advance its Open Book Account claim. *See Maggio, Inc. v. Neal,* 196 Cal. App. 3d 745, 752 (Ct. App. 1987). Accordingly, the Court **DENIES** Defendant's motion to dismiss Plaintiff's Open Book Account claim.

## C. THIRD CAUSE OF ACTION: QUANTUM MERIUT

Plaintiff asserts a claim under *quantum meriut* as an alternative to the breach of contract claim. The SAC alleges Defendant received the benefit of additional work beyond that which was agreed to in the operative contract. Plaintiff further contends the City of San Diego permits would not have been approved, nor would construction have progressed,

without HDR's services and Defendant was unjustly enriched by the value of those services. Defendant maintains that all work, except work triggered by one of three exceptions, was covered under the Modification Request. He claims that to the extent a valid contract exists, the parties are entitled to the benefit of the bargain and HDR is not entitled to compensation for additional work under the theory of *quantum meruit*.

A plaintiff may plead inconsistent claims based upon allegations of the existence and absence of an enforceable agreement. *Klein v. Chevron U.S.A. Inc*., 202 Cal.App. 4th 1342, 1388 (2012). The theory of "quantum meruit (or quasi-contract) is an equitable remedy implied by the law under which a plaintiff who has rendered services benefiting the defendant may recover the reasonable value of those services when necessary to prevent unjust enrichment of the defendant." *In re De Laurentiis Entertainment Group, Inc*., 963 F.2d 1269, 1272 (9th Cir. 1992). To meet the demands of justice, "quantum meruit …supplies, by implication and in furtherance of equity … missing contractual terms" and implies by law a contract to pay for services rendered." *Hedging Concepts, Inc. v. First Alliance Mortgage Co*., 41 Cal.App.4th 1410, 1419 (Ct. App. 1996).

The original contract's underlying assumptions, the Modification Request and the parties ongoing email communications make it clear that the operative contract covered a specified volume of soil to be processed based on the surficial area and depth of the ground to be disturbed or impacted by the construction. Any services rendered beyond these specifications were outside of the terms of the contract and the scope of work bargained for by the parties. When a contracting party continues to demand performance outside the scope of work agreed upon, "the contractor may continue to work after unsuccessful negotiations and subsequently recover the value of that work." *Ted Jacob Eng'g Grp., Inc.,* 187 Cal. App. 4th 945, 966 (2010) (agreeing with the trial court that a contractor faced with a substantial change in its originally contracted scope of work, who is unable to successfully negotiate a price for that additional work, may elect to continue to work and reserve its right to subsequently obtain a judicial determination as to the value of the changes.) Plaintiff's SAC alleges a sufficient factual basis to support a claim for an

18

equitable remedy and therefore, the Court **DENIES** Defendant's motion to dismiss Plaintiff's *quantum meriut* claim.

### D. FOURTH CAUSE OF ACTION: PROMISSORY FRAUD

A claim for Promissory fraud requires "(1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud, i.e., induce reliance; (4) justifiable reliance; and (5) resulting damage." *Bell Gardens Bicycle Casino v. Great Am. Ins. Co*., 124 F. App'x 551, 553 (9th Cir. 2005). Rule 9(b) requires that the circumstances of fraud be plead with particularity except "conditions of a person's mind [which] may be alleged generally." *Fed.R.Civ.P*. 9(b). Describing promissory fraud as "a subspecies of the action for fraud and deceit," the California Supreme Court stated:

> An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract. (citations omitted). In such cases, the plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract. 'If it is enforceable, the [plaintiff] ... has a cause of action in tort as an alternative at least, and perhaps in some instances in addition to his cause of action on the contract.'

*Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996).

Defendant contends Plaintiff's promissory fraud claim fails because Doug Deason was not Defendant's agent and because HDR fails to adequately allege: (1) actionable misrepresentation; (2) reasonable reliance on representations made; and (3) Defendant's intention not to perform at the time the representations were made.

### 1. Sufficiency of Plaintiff's Agency Allegations

It is well known that "[a] principal is liable for an agent's misrepresentations that cause pecuniary loss to a third party, when the agent acts within the scope of his apparent authority." *Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp*., 456 U.S. 556, 566, (1982). Generally, an agent is one who is authorized to act for or in the place of another. *Black's Law Dictionary* (10th ed. 2014). A person may have either actual or apparent authority to act on behalf of another when a principal: (1) expressly delegates authority or tells the agent what to do, (2) knowingly acquiesces to the agent's actions, or (3) implicitly appoints one to a position that ordinarily possesses certain powers. *Hawaiian Paradise*

*Park Corp. v. Friendly Broad. Co.*, 414 F.2d 750, 756 (9th Cir. 1969); *Salyers v. Metropolitan Life Insurance Co.*, 871 F.3d 934, 939 (9th Cir. 2017). Actual authority may also be implied when a relationship exists between the principal and the agent that justifies a finding that the agent was authorized to perform certain acts.

Relying on emails referenced by Plaintiff, and attached as exhibits in support of its Motion to Dismiss, Defendant argues that the agency allegations are inconsistent with the documentary evidence. Defendant reasons that the email exchanges show Doug advised HDR that Deason had to approve any proposed contract modification. Nonetheless, an agent may be authorized to perform a multitude of tasks (i.e. negotiation of terms or liaison between parties). The agency relationship need not be based on one's approval authority alone. Plaintiff alleges (1) it had no direct contact with Defendant, (2) Defendant requested that HDR communicate with Doug, and (3) Defendant attempted to negotiate contract terms through Doug[6]. Plaintiff also alleges, and email communications reflect, that Defendant was aware of Doug's ongoing interactions with Plaintiff. Inaction by a principal creates apparent authority "when it provides a basis for a third party reasonably to believe the principal intentionally acquiesces in the agent's representations or actions." *Salyers*, 871 F.3d at 939 (9th Cir. 2017) (quoting Restatement (Third) of Agency § 3.03 (2006)). Plaintiff's complaint alleges facts sufficient to support a reasonable inference that Defendant and his son had an agency relationship.

## 2. Actionable Misrepresentation

Defendant contends Doug's opinions and expressions of "belief" regarding future action by some third party are not actionable misrepresentations. HDR alleges that Doug, through phone conversations and an in-person meeting, told HDR that it would be compensated for its work outside the scope of the Agreement and Modification Request. Plaintiffs' SAC alleges Defendant's son assured HDR of their [Darwin and Doug

---

[6] Plaintiff highlights that Doug was President of Defendant's Texas LLC and that correspondence with Doug was done via Defendant's company email address.

Deason's] commitment to getting a contract modification done, that HDR would be compensated for additional work, set a deadline by which to accomplish an executed agreement, and promised to send a compromise back to HDR after getting Defendant's approval. *Doc. No 29, p.11, 13; SAC ¶¶ 51 (f), (g), (o)*. These alleged misrepresentations are specific, definite, unequivocal, and plead with sufficient particularity to be actionable under Rule 8(a) and 9(b) for a claim of promissory fraud.

### 3. Justifiable Reliance

Plaintiffs offer that these misrepresentations were made by Defendant's son on behalf of Defendant to induce HDR to continue providing services. However, Defendant contends since Doug made it clear his father's approval was required, any reliance on Doug's representations was not justified. Finding that Plaintiff's pleadings are sufficient to allege Doug acted as an agent for his father, the Court also finds the element of justifiable reliance sufficiently plead. "It is ... for the ultimate interest of persons employing agents, as well as for the benefit of the public, that persons dealing with agents should be able to rely upon apparently true statements by agents who are purporting to act and are apparently acting in the interests of the principal." *Am. Soc. of Mech. Engineers, Inc.*, 456 U.S. at 567 (quoting favorably Restatement § 262, Comment a, p. 572.).

Defendant also argues that HDR fails to allege reasonable reliance because HDR returned to work prior to any alleged broken promises or misrepresentation's being made. Although HDR returned to the site prior to communicating with Doug, its allegation that it continued to perform due to Doug's representation that it would receive pay for the additional work performed is reasonable. HDR alleges they relied on Defendant's representations to their detriment and suffered harm in the principal sum of $1,125,486.16. The Court finds Plaintiff's allegations sufficient to assert justifiable reliance.

### 4. Intent to Defraud or Induce Reliance

Promissory fraud requires the "intent to defraud or induce reliance." Defendant contends the alleged promises or representations made by Doug reflect a genuine intent to engage in discussion aimed at settlement. Plaintiff asserts, however, that the statements

were false, Defendant had knowledge of the falsity and, at the time the statements were made, he had no intent to execute a second modification or pay additional monies - only to induce HDR to continue providing services. *Doc. No 29, p. 13; SAC ¶¶ 51-52.* Plaintiff further alleges Defendant's misrepresentations were made in an effort to ensure completion of the construction project and maintain compliance with the City's permit requirements. Plaintiff's assertion that Defendant first notified HDR of its unwillingness to provide any additional compensation when HDR's work was almost complete provides support for its allegation of fraudulent intent sufficient to survive a motion to dismiss. *See Stocco v. Gemological Inst. of Am., Inc.,* No. 12-CV-1291 WQH DHB, 2015 WL 472143, at *17 (S.D. Cal. Feb. 5, 2015) ("something more than nonperformance is required to prove the defendant's intent not to perform his promise (citations omitted)). Whether Defendant harbored fraudulent intent is an issue of fact. At this stage in the pleadings the Court must construe all facts in the light most favorable to Plaintiff. The Court finds Plaintiffs allegations as to Defendant's intent are sufficiently plead to state a claim for relief for Promissory fraud. Defendant's motion to dismiss is DENIED.

### III. LEAVE TO AMEND

Defendant seeks dismissal of the claims without leave to amend. The Court finds that the allegation of other facts could cure the deficiencies detailed herein and determines it appropriate to provide Plaintiff an opportunity to amend.

### CONCLUSION AND ORDER

Based on the foregoing, **IT IS HEREBY ORDERED**:

1. Defendant's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.

    a. The motion is **GRANTED** as to Plaintiff's claim for Breach of Contract.

    b. The motion is **DENIED** as to Plaintiff's claims for Open Book Account, *Quantum Meruit*, and Promissory Fraud.

2. If Plaintiff wishes to amend the complaint to cure the deficiencies noted, Plaintiff shall file a Third Amended Complaint no later than 30 days from the filing date of this order.

**IT IS SO ORDERED.**

DATED: March 28, 2018

Hon. JOHN A. HOUSTON
UNITED STATES DISTRICT JUDGE